**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION; AMERICAN CIVIL LIBERTIES UNION FOUNDATION, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES CUSTOMS AND BORDER PROTECTION; UNITED STATES DRUG ENFORCEMENT ADMINISTRATION; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES DEPARTMENT OF JUSTICE; FEDERAL AVIATION ADMINISTRATION; FEDERAL BUREAU OF INVESTIGATION; FEDERAL PROTECTIVE SERVICE; UNITED STATES MARSHALS SERVICE; and UNITED STATES SECRET SERVICE, <br><br> Defendants. | Case No. |

## COMPLAINT

### INTRODUCTION

1. The American Civil Liberties Union and American Civil Liberties Union Foundation ("Plaintiffs" or "ACLU") bring this action under the Freedom of Information Act ("FOIA") to compel U.S. Customs and Border Protection ("CBP"), Drug Enforcement Administration ("DEA"), Department of Homeland Security ("DHS"), Department of Justice ("DOJ"), Federal Aviation Administration ("FAA"), Federal Bureau of Investigation ("FBI"), Federal Protective Service ("FPS"), U.S. Marshals Service ("USMS"), and U.S. Secret Service ("USSS")

1

(collectively, "Defendants" or "Defendant Agencies") to release records about their aerial surveillance and flight monitoring of nationwide protests following the death of George Floyd in May 2020.

2. A Minneapolis police officer murdered George Floyd on May 25, 2020. In the days, weeks, and months that followed, people around the country gathered together to exercise their constitutional right to protest police brutality. As of October 2021, people across at least 140 cities had joined in these protests.[1]

3. Law enforcement around the country responded to these protests with excessive force and significant violence.[2]

4. Protesters were further subjected to widespread, pervasive surveillance by Defendant Agencies via advanced aerial systems, including unmanned drones, helicopters, and spy planes. Such systems are typically reserved for investigating human trafficking and smuggling operations, gang activity, or monitoring U.S. borders.[3]

---

[1] *See* Derrick Bryson Taylor, *George Floyd Protests: A Timeline*, N.Y. Times (Nov. 5, 2021), https://www.nytimes.com/article/george-floyd-protests-timeline.html.

[2] *See* Kim Barker, Mike Baker & Ali Watkins, *In City After City, Police Mishandled Black Lives Matter Protests*, N.Y. Times (June 28, 2021), https://www.nytimes.com/2021/03/20/us/protests-policing-george-floyd.html; Brakkton Booker, Bill Chappell, David Schaper, Danielle Kurtzleben, and Joseph Shapiro, *Violence Erupts As Outrage Over George Floyd's Death Spills Into A New Week*, NPR (June 1, 2020), https://www.npr.org/2020/06/01/866472832/violence-escalates-as-protests-over-george-floyd-death-continue; *George Floyd: Videos of police brutality during protests shocks US,* B.B.C. News (June 5, 2020), https://www.bbc.com/news/world-us-canada-52932611; Madeline Holcombe & Jacqueline Howard, *'Less lethal' police weapons tied to serious injuries during George Floyd protests, researchers say,* CNN (Jan. 14, 2021), https://www.cnn.com/2021/01/14/us/george-floyd-protest-injuries-less-lethal/index.html.

[3] *See* Sam Richards, *This Is Footage From a Spy Plane That Flew Above George Floyd Protests in Minneapolis*, Vice (Jul. 29, 2020), https://www.vice.com/en/article/qj4end/this-is-footage-from-a-spy-plane-that-flew-above-george-floyd-protests-in-minneapolis; Zolan Kanno-Youngs, *U.S. Watched George Floyd Protests in 15 Cities Using Aerial Surveillance*, N.Y. Times (June 19, 2020), https://www.nytimes.com/2020/06/19/us/politics/george-floyd-protests-surveillance.html; Sam Biddle, *U.S. Marshals Used Drones to Spy on Black Lives Matter Protests in Washington, D.C.,* N.Y. Times (Apr. 22, 2021), https://theintercept.com/2021/04/22/drones-black-lives-matter-protests-marshals/; Pete Muntean & Gregory Wallace, *US government spy planes monitored George Floyd protests,* CNN (June 12, 2020), https://www.cnn.com/2020/06/11/politics/spy-planes-george-floyd-protests/index.html; Peter Aldhous, *The FBI Used Its Most Advanced Spy Plane to Watch Black Lives Matter Protests*, Buzzfeed News (June 20, 2020), https://www.buzzfeednews.com/article/peteraldhous/fbi-surveillance-plane-black-lives-matter-dc; Katie Schoolov, *As protests over the killing of George Floyd continue, here's how police use powerful surveillance tech to*

5. On August 4, 2020, the ACLU submitted a FOIA request to Defendants DOJ, FBI, USMS, DEA, and DHS ("Request A"). As described in further detail below, DHS transferred Request A to Defendants CBP, ICE, USSS, and FPS. DOJ transferred Request A to Defendants FBI, DEA, and USMS.

6. On August 4, 2020, the ACLU also submitted a FOIA request to Defendant FAA ("Request B").

7. Requests A and B (collectively, "the Requests") cover information that is vital to the ongoing public debate about law enforcement transparency and oversight, law enforcement budgets, misuse of force against civilians, and the future of policing in America.[4]

8. To date, the ACLU has received one production in total, consisting of two largely redacted pages from only one of the nine Defendant Agencies, USSS. The remaining Defendant Agencies have either stated that they have no responsive records, refused to confirm or deny the existence of the records sought, or have had the relevant request under review for more than a year without a response.

9. Plaintiffs now ask the Court for an injunction requiring Defendants to adequately search for, confirm the existence of, and produce responsive records to the Requests. Plaintiffs also seek an order enjoining the Defendants from assessing fees for the processing of the Requests.

---

*track them,* CNBC (June 18, 2020), https://www.cnbc.com/2020/06/18/heres-how-police-use-powerful-surveillance-tech-to-track-protestors.html.

[4] Neil MacFarquhar, *Departures of Police Officers Accelerated During a Year of Protests,* N.Y. Times (Jun. 24, 2021), https://www.nytimes.com/2021/06/11/us/police-retirements-resignations-recruits.html; Jessica Learish, *Defund the police? Police budgets of major U.S. cities,* CBS News (Sept. 30, 2021), https://www.cbsnews.com/pictures/defund-the-police-police-budgets-of-major-us-cities/; Press Release, Department of Justice Announces the Release of New Reports on Civilian Oversight of Law Enforcement, Dep't of Just. Off. of Community Oriented Policing Servs. (Aug. 5, 2021), https://cops.usdoj.gov/pressrelease/department-justice-announces-release-new-reports-civilian-oversight-law-enforcement; Emma Tucker, Peter Nickeas & Christina Carrega, *State AGs are 'stepping into the police reform business' to hold officers accountable,* CNN (Sept. 25, 2021), https://www.cnn.com/2021/09/25/us/state-attorneys-general-police-reform/index.html.

JURISDICTION AND VENUE

10. This Court has jurisdiction pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

11. Venue lies in the Southern District of New York pursuant to 5 U.S.C. § 552(a)(4)(B), because it is the district in which the Plaintiffs have their principal place of business.

PARTIES

12. Plaintiff American Civil Liberties Union is a nationwide, non-profit, nonpartisan 26 U.S.C. § 501(c)(4) organization, incorporated in the District of Columbia and with its principal place of business in New York City. The American Civil Liberties Union's mission is to maintain and advance civil rights and civil liberties and to ensure that the U.S. government acts in compliance with the Constitution and laws of the United States. The American Civil Liberties Union is also committed to principles of transparency and accountability in government, and seeks to ensure that the American public is informed about the conduct of its government in matters that affect civil liberties and human rights. Obtaining information about governmental activity, analyzing that information, and widely publishing and disseminating it to the press and the public is a critical and substantial component of the American Civil Liberties Union's work and one of its primary activities. In addition, the American Civil Liberties Union regularly works to protect the rights implicated by the records sought by the Requests, including the rights of people to protest, to be free from unwarranted intrusions of privacy, and to be protected from unlawful searches.

13. Plaintiff American Civil Liberties Union Foundation is a separate 26 U.S.C. § 501(c)(3) organization that educates the public about civil liberties and employs lawyers who provide legal representation free of charge in cases involving civil liberties. It is incorporated in New York State and has its principal place of business in New York City.

4

14. Defendant CBP is a component of DHS and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

15. Defendant DEA is an agency within the meaning of 5 U.S.C. § 552(f)(1).

16. Defendant DHS is an agency within the meaning of 5 U.S.C. § 552(f)(1).

17. Defendant DOJ is an agency within the meaning of 5 U.S.C. § 552(f)(1).

18. Defendant FAA is an agency within the meaning of 5 U.S.C. § 552(f)(1).

19. Defendant FBI is an agency within the meaning of 5 U.S.C. § 552(f)(1).

20. Defendant FPS is a component of DHS and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

21. Defendant USMS is an agency within the meaning of 5 U.S.C. § 552(f)(1).

22. Defendant USSS is an agency within the meaning of 5 U.S.C. § 552(f)(1).

FACTUAL BACKGROUND

Surveillance of Nationwide Protests

23. On June 6, approximately half a million people across more than 500 cities in the United States protested the police killing of George Floyd.[5] Over the following weeks, between 15 million and 26 million people consistently demonstrated across a geographic spread unseen in U.S. history, with at least one protest occurring in more than 40 percent of counties nationwide.[6]

24. Protests began in Minneapolis one day after Derek Chauvin, a police officer, murdered George Floyd, and by the next day were occurring cross-country, in some of the nation's largest cities.[7] Peaceful demonstrations continued consistently for more than a month, spurring

---

[5] Larry Buchanan, Quoctrung Bui & Jugal K. Patel, *Black Lives Matter May Be the Largest Movement in U.S. History,* N.Y. Times (July 3, 2020), https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html.

[6] *Id.*

[7] Bryson Taylor, *supra* note 1.

international movements in solidarity and ongoing advocacy against law enforcement's racial biases and related violence.[8]

25. Law enforcement responded to this social movement of millions of people exercising their right to protest police violence with more violence. They deployed tear-gas and other similar chemical weapons, bombarded people with rubber bullets, engaged in mass arrests, beat protesters with batons, and more.[9]

26. The federal government made resources such as National Guard aerial troops and military surveillance capacities available to local law enforcement departments, giving countless cities' police departments access to some of the military's surveillance equipment.[10]

27. By June 19, 2020, DHS alone had logged at least 270 hours of surveillance footage across 15 cities.[11]

28. A few months after protests initially began, Congress raised concerns about potential misuses of military capabilities and federal agency processes, given the extensive nature of aerial footage collected on behalf of these police departments.[12]

---

[8] Alex Altman, *Why The Killing of George Floyd Sparked an American Uprising,* Time (June 4, 2020), https://time.com/5847967/george-floyd-protests-trump/.

[9] Erica Chenoweth and Jeremy Pressman, *This summer's Black Lives Matter protesters were overwhelmingly peaceful, our research finds,* The Washington Post (Oct. 16, 2020), https://www.washingtonpost.com/politics/2020/10/16/this-summers-black-lives-matter-protesters-were-overwhelming-peaceful-our-research-finds/.

[10] April Glaser, *Who decides when there are helicopters? Experts weigh in on National Guard monitoring protests,* NBC News (Jan. 10, 2021), https://www.nbcnews.com/business/business-news/who-decides-when-there-are-helicopters-experts-weigh-national-guard-n1253599.

[11] Kanno-Youngs, *supra* note 3.

[12] Anna G. Eshoo, Bobby L. Rush & Ron Wyden, *Letter to U.S. Privacy and Civil Liberties Oversight Board,* U.S. Congress (Oct. 15, 2020), https://eshoo.house.gov/sites/eshoo.house.gov/files/Eshoo-Rush-Wyden%20ltr%20to%20PCLOB%20re%20protests%20-%2010.15.20.pdf; John D. McKinnon and Michelle Hackman, *Drone Surveillance of Protests Comes Under Fire,* The Wall Street Journal (June 10, 2020), https://www.wsj.com/articles/drone-surveillance-of-protests-comes-under-fire-11591789477.

29.    In an August 2020 internal investigation, the Inspector General for the Air Force noted that, using this surveillance, "it would be possible" for specific individuals to be connected to activities across different periods of time by developing a "pattern of life" of their movements, and expressed concern that "intelligence assets" could be used "for non-intelligence purposes … absent proper oversight."[13]

30.    The nature and collection of this footage by Defendants raises significant civil liberties concerns. Aerial surveillance technologies can collect a diverse range of incredibly invasive data including GPS location, faceprints, and automatic license plate readings.[14] This information can be used to identify individual people, connect them to specific locations at specific times, determine where they live and what vehicle they drive, create patterns of their whereabouts, deduce routines in their daily lives, and more.[15] Marginalized populations are especially threatened by this type of surveillance—in particular, people of color are more likely to be misidentified by a facial recognition algorithm[16] and simultaneously more likely to be prejudicially targeted by law enforcement.[17]

31.    The ACLU of Northern California, after a yearlong public records investigation of the California Highway Patrol, obtained footage from aerial surveillance of protests in California. The

---

[13] The Inspector Gen. Dep't of the Air Force, *Report of Investigation (S8934P)*, Dep't of the Air Force, 19 (Aug. 2020), https://media.defense.gov/2020/Aug/21/2002482179/-1/-1/1/REPORT_OF_INVESTIGATION_CONCERNING_RC_26B_OPERATIONS_1_4_JUNE_2020.PDF?fbclid=IwAR2kS4PxhXRMJyH_HN6MOvDqxq4uQ_IYsDnIzQoycUWgT4p7Ybapu5xv39k.

[14] Electronic Privacy Information Center, *Surveillance Oversight: Drones and Aerial Surveillance,*https://epic.org/issues/surveillance-oversight/aerial-surveillance/.

[15] *Id.*

[16] Kade Crockford, *How is Face Recognition Surveillance Technology Racist?,* American Civil Liberties Union (June 16, 2020), https://www.aclu.org/news/privacy-technology/how-is-face-recognition-surveillance-technology-racist/.

[17] American Civil Liberties Union, *Racial Profiling,* https://www.aclu.org/issues/racial-justice/race-and-criminal-justice/racial-profiling.

footage clearly shows that law enforcement zoomed in on individual faces and recorded people in personal, intimate interactions, such as vigils to pay respect to lives lost, offering water to others, dancing, and other forms of participation in peaceful protest and community gathering. The surveillance footage only focused on protests against police violence and not any of the other protests that were also occurring at the time, such as protests against Covid restrictions, including shelter-in-place orders.[18]

32. Aerial surveillance of mass protests presents serious First Amendment concerns. Government monitoring of protests poses a high risk of chilling constitutionally protected speech and implicates associational rights, which are deeply intertwined with free speech, as people can be identified in groups and as supporters of certain advocacy efforts or viewpoints. *See NAACP v. Alabama,* 357 U.S. 449, 460 (1958) ("this Court has more than once… remark[ed] upon the close nexus between the freedoms of speech and assembly.").

33. The Fourth Amendment is also heavily implicated. Aerial surveillance technologies impinge upon several established areas of privacy rights—a person's location and movement patterns, including to their home, in their vehicle, and to other sensitive locations—without any individualized suspicion.[19] Prolonged surveillance of individuals' locations in this manner also bypasses any requirement of judicial approval or court oversight. *See U.S. v. Jones,* 565 U.S. 400, 404 (2012) (warrantless GPS-monitoring of an individual's vehicle was a "search" within the meaning of the Fourth Amendment); *Carpenter v. United States,* 138 S. Ct. 2206, 2217 (2018) ("individuals have a reasonable expectation of privacy in the whole of their physical movements");

---

[18] Matt Cagle, *Recordings Show the California Highway Patrol's Aerial Surveillance of Racial Justice Protests,* American Civil Liberties Union of Northern California (Nov. 16, 2021), https://www.aclunc.org/blog/recordings-show-california-highway-patrol-s-aerial-surveillance-racial-justice-protests.

[19] Peter Aldhous, *Find the Police and Military Planes that Monitored the Protests in Your City with These Maps*, Buzzfeed News (June 2, 2020), https://www.buzzfeednews.com/article/peteraldhous/george-floyd-protests-police-military-planes.

*Leaders of a Beautiful Struggle v. Baltimore Police Dept.,* 2 F.4th 330, 346 (4th Cir. 2021) (holding that citywide aerial surveillance program in Baltimore constituted an unlawful search under the Fourth Amendment).

Requested Records

34. On August 4, 2020, Plaintiffs submitted Request A to Defendant Agencies DOJ, FBI, USMS, DEA, and DHS. A true and accurate copy of Request A is attached as Exhibit A.

35. Referencing a non-exhaustive list of 37 specific aircrafts used for aerial surveillance purposes, Request A sought six categories of records, including:

1) All records (including directives, contracts, agreements, communications, and flight logs) regarding listing, logging, or describing surveillance or monitoring flights over any city conducted, contracted, or requested by any local, state, or federal agency in the United States from May 25, 2020 to present;

2) All records regarding surveillance or monitoring equipment carried on such flights, including its capabilities and description of the data gathered by it;

3) All records regarding any proposal, approval, or authorization to conduct or engage others to conduct surveillance or monitoring flights over American cities from May 25, 2020 to present;

4) All surveillance footage (including, but not limited to, photographs, videos, and electronic footage) collected during surveillance or monitoring flights over American cities from May 25, 2020 to present.

5) All records (dated January 1, 2016 or later) regarding policies, practices, and procedures for conducting or contracting surveillance or monitoring flights and for storing, accessing, analyzing, sharing, and otherwise interacting with records collected during such flights (including photographs, videos, and electronic surveillance records), including, but not limited to, documents that describe:

    a) the legal justification and factual showing required before a surveillance flight is authorized;

    b) the purpose for which collected data may or may not be accessed; and

    c) who may access the collected data, what procedures they must go through to access the data, and who may authorize access;

9

6) All contracts, agreements, and communications with private companies to conduct surveillance or monitoring flights over American cities, to operate surveillance or monitoring equipment installed on aircraft conducting such fights, or to store, analyze, or transmit data or information collected during such flights;

36. On August 4, 2020, Plaintiffs submitted Request B to Defendant Agency FAA. A true and accurate copy of Request B is attached as Exhibit B.

37. Request B sought all records—including airworthiness documentation, registration documentation, technical specifications, and modification applications—regarding a list of 54 specific aircrafts.

38. In both Requests, Plaintiffs sought a waiver of search, review, and duplication fees on the basis that disclosure of the requested records is "in the public interest" and because it is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

39. In both Requests, Plaintiffs also sought a limitation of fees on the basis that Plaintiffs qualify as a "representative of the news media" and the records are not sought for commercial use. *Id.* § 552(a)(4)(A)(ii)(II).

<u>Defendants' Responses to the Requests and Procedural Timeline</u>

*<u>CBP</u>*

40. On August 18, 2020, CBP sent Plaintiffs a letter acknowledging receipt of Request A.

41. On July 15, 2021, CBP sent Plaintiffs a letter denying expedited processing of Request A.

42. On November 21, 2021, CBP sent Plaintiffs an email determining that the request for fee waiver was not applicable.

10

43. Plaintiffs have received no further communication from CBP and have exhausted administrative remedies due to CBP's delay beyond the lawful response time under FOIA.

*DEA*

44. On August 17, 2020, DEA sent Plaintiffs a letter acknowledging receipt of Request A and granting expedited processing, but stated that the records fall under "unusual circumstances" justifying an extension of time for Defendant to respond.

45. On December 2, 2020, DEA sent Plaintiffs a letter advising that Request A was under review.

46. Plaintiffs have received no further communication from DEA and have exhausted administrative remedies by DEA's delay beyond the lawful response time under FOIA.

*DHS*

47. On August 17, 2020, DHS sent Plaintiffs a letter acknowledging receipt of Request A, granting expedited processing, conditionally granting a waiver of fees, and invoking a ten-day extension to respond.

48. On August 17, 2020, DHS sent Plaintiffs a letter stating that Request A would be transferred to CBP, ICE, USSS, and FPS. The letter also stated that it would be Defendant DHS' final communication to Plaintiffs regarding Request A.

49. Plaintiffs have received no further communication from DHS, with the exception of responses regarding Plaintiffs' appeal of FPS' response, described below, and have exhausted administrative remedies by receiving no response to their appeal within the 30-day time period.

50. On August 5, 2020, DOJ sent Plaintiffs a letter acknowledging receipt of Request A and referring it to DOJ components FBI, DEA, and USMS.

51. Plaintiffs have received no further communication from DOJ and have exhausted administrative remedies by DOJ's delay beyond the lawful response time under FOIA.

52. On August 4, 2020, FAA sent Plaintiffs an email acknowledging receipt of Request B.

53. On August 11, 2020, FAA sent Plaintiffs an email stating that the Air Traffic service "does not maintain" the requested records and that FAA was further reviewing the request. FAA also noted that the Civil Aviation Registry would be able to respond with aircraft records for some of the airplanes listed in Request B but that "the FAA does not have aircraft records of military aircrafts" and that "law enforcement is not required to notify the FAA when they deploy their assets." FAA also provided a link to a public website containing some information about technical specifications for some aircrafts listed in Request B.

54. On August 19, 2020, Plaintiffs sent an email to FAA Air Traffic Service requesting clarification on the lack of records about law enforcement's use of military assets, requesting a full response from the Civil Aviation Registry (including records for the 54 specific airplanes listed in Request B, and explanations for the lack of records for military aircrafts), and clarifying that the Aircraft Certification information available on the public website did not include the underlying registration and airworthiness documents for each aircraft.

55. On Sept. 9, 2020, Plaintiffs received a letter from the FAA Office of Security & Hazardous Materials Safety (ASH), Office of National Security Programs & Incident Response

(AXE), and its components (LEAP) stating that no responsive records were yielded by Defendant FAA's search, resulting in a "no records" determination for Request B.

56. On December 7, 2020, Plaintiffs filed an appeal with the FAA ASH and AXE offices regarding the no records determination on the grounds that the search was inadequate.

57. On December 16, 2020, FAA acknowledged receipt of the appeal via email.

58. Plaintiffs have received no further communication from FAA and have exhausted administrative remedies by receiving no response to their appeal with regard to ASH/AXE and no response to their clarifications with regards to the Air Traffic Service.

*FBI*

59. On August 11, 2020, Plaintiffs received a letter from FBI acknowledging receipt of Request A and consideration of the waiver of fees.

60. On September 8, 2020, Plaintiffs received a letter from FBI neither confirming nor denying the existence of responsive records under FOIA exemption (b)(7)(E) along with addenda of standardized responses.

61. On December 7, 2020, Plaintiffs appealed the FBI's refusal to confirm or deny the existence of records, arguing that the agency must justify a Glomar response with "reasonably detailed explanations," and that it was unlikely exemption (b)(7)(E) applied to all the requested records.

62. On January 27, 2021, Plaintiffs received a letter from FBI acknowledging receipt of the appeal.

63. On December 2, 2021 Plaintiffs' appeal was partially granted—specifically, and solely, with respect to Section (5) of Request A. As a result, that portion of Plaintiffs' request was remanded in part to the FBI, for a search of responsive records as to that section. Plaintiffs' appeal

with respect to the FBI's refusal to confirm or deny the existence of any records that are responsive to Sections (1) through (4) and (6) of Request A was denied. Plaintiffs have thus exhausted their administrative remedies with respect to Sections (1) through (4) and (6).

*FPS*

64. On September 9, 2020, Plaintiffs received a letter from DHS stating that component FPS possessed no responsive records and referring Request A to CBP.

65. On December 7, 2020, Plaintiffs filed an appeal challenging the adequacy of FPS' search.

66. On December 14, 2020, Plaintiffs received a letter from DHS acknowledging receipt of the appeal.

67. On July 13, 2021, DHS sent Plaintiffs a letter remanding Plaintiffs' December 7, 2020 appeal to FPS and advising that the appeal would be resolved within 30 days.

68. Plaintiffs have received no further communication from FPS and have exhausted administrative remedies by receiving no response to their appeal.

*USMS*

69. On August 17, 2020, Plaintiffs received a letter acknowledging receipt of Request A.

70. Plaintiffs have received no further communication from USMS and have exhausted administrative remedies by USMS' delay beyond the lawful response time under FOIA.

*USSS*

71. On August 19, 2020, Plaintiffs received a letter acknowledging receipt of Request A.

72. On August 27, 2020, Plaintiffs received a letter stating that USSS had completed searching for responsive records and was processing the records located.

73. On March 19, 2021, Plaintiffs received a final response letter stating that two responsive pages would be produced and twenty-four responsive pages withheld entirely. Two pages were produced with the majority of the content redacted.

74. On June 17, 2021, Plaintiffs filed an appeal challenging the redactions and withheld pages.

75. Plaintiffs have received no further communication from USSS and have exhausted administrative remedies by receiving no response to their appeal.

CAUSES OF ACTION

76. Defendants have failed to produce records responsive to the Requests.

77. Defendants' failure to promptly make available the records sought by the Requests violates FOIA, 5 U.S.C. § 552(a)(3)(A), (a)(6)(A), and Defendants' corresponding regulations.

78. Defendants' failure to conduct an adequate search for records responsive to the Requests and timely resolve appeals violates FOIA, *id.* § 552(a)(3)(C), (D), and Defendants' corresponding regulations.

79. Defendants' failure to process the Requests expeditiously and as soon as practicable violates FOIA, *id.* § 552(a)(6)(E), and Defendants' corresponding regulations.

80. Plaintiffs are entitled to a waiver of all search, review, processing, and duplication fees in connection with the Requests, and Defendants' failure to grant Plaintiffs' requests for waiver and limitation of fees violates FOIA, *id.* § 552(a)(4)(A), (a)(6), and Defendants' corresponding regulations.

81. Plaintiffs have exhausted administrative remedies to the extent required by law.

<u>REQUESTED RELIEF</u>

Plaintiffs respectfully ask this Court to GRANT the following relief:

1.  Order Defendants CBP, DEA, DHS, DOJ, FPS, USMS, and USSS to immediately conduct adequate searches for all records responsive to Request A;

2.  Order Defendant FBI to immediately conduct adequate searches for all records responsive to Request A, excluding Section 5;

3.  Order Defendant FAA to immediately conduct adequate searches for all records responsive to Request B;

4.  Order Defendants to produce all requested records on an expedited scheduled established by the Court;

5.  Enjoin Defendants from charging Plaintiffs search, review, processing, and duplication fees in connection with responding to the Requests;

6.  Award Plaintiffs costs and reasonable attorneys' fees in the action; and

7.  Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Shreya Tewari*

| | |
|---|---|
| Robert Hodgson | Shreya Tewari |
| New York Civil Liberties Union Foundation | Brett Max Kaufman |
| 125 Broad St., 19th Floor | American Civil Liberties Union Foundation |
| New York, NY 10004 | 125 Broad St., 18th Floor |
| (212) 607-3300 | New York, NY 10004 |
| rhodgson@nyclu.org | (212) 549-2500 |
| | stewari@aclu.org |
| | bkaufman@aclu.org |

*Counsel for Plaintiffs*

December 7, 2021